98  381
99   51
98   381
140  ³160

THE MICHIGAN SAVINGS BANK v. THE ESTATE OF
MILTON H. BUTLER, DECEASED.

*Partnership—Liability of silent member—Evidence.*

1. Where, in a suit against the estate of a deceased person, the defendant objects to testimony drawn out on the redirect examination of one of the plaintiff's witnesses as inadmissible because the facts testified to, if true, must have been equally within the knowledge of the decedent, the objection is answered by the fact that the counsel for the estate first opened up the subject covered by the testimony on the cross-examination of the witness, and, in the Supreme Court on appeal, by the further fact that, if the testimony complained of had been excluded, sufficient uncontradicted testimony would have been left to justify the direction of a verdict in favor of the plaintiff.[1]

---

[1] For cases bearing upon the question of the *waiver* of the provisions of 3 How. Stat. § 7545, prohibiting the opposite party, in a suit prosecuted or defended by the heirs, etc., of a deceased person, from testifying to facts which, if true, must have been equally within the knowledge of the decedent, see:

1. *Smith's Appeal*, 52 Mich. 415, 419, holding that where a party whose testimony, if objected to, would be excluded under the provisions of the statute is giving testimony in a cause, and the opposite party calls out facts equally within the knowledge of the deceased, and afterwards seeks to prove the statements so made under oath in a controversy between the same parties, as admissions, he must be held to have waived the inhibition of the statute, and the witness may testify fully in respect to the subject-matter of the admissions, although it be equally within the knowledge of the deceased.

2. *Beardslee v. Reeves*, 76 Mich. 661, holding that where, on the trial of a suit brought by an administrator for the conversion of property belonging to the estate, as alleged, the examination of the defendant, taken in the probate court, is introduced to show defendant's admissions of such conversion, he is entitled to introduce his *entire* examination, or such parts as he deems material,

2. Evidence of what a witness testified to on a former trial is properly excluded as hearsay, until he has been called as a witness on the second trial, and the proper foundation laid for such evidence.

3. Where in a suit against the estate of a deceased dormant copartner upon the personal note of the managing member of the firm, discounted by him, the uncontradicted testimony shows that such member had advanced money on checks drawn on the firm bank account, in the course of its business, to nearly the amount of the note, and had retained the checks until the note was discounted, and then, instead of depositing the proceeds to the credit of the firm and presenting the checks for payment, had turned them over to the book-keeper of the firm, and been given credit for the difference between the amount of the checks and the discount on the note and the amount of the note, a verdict is properly directed in favor of the plaintiff, on the ground that the evidence shows that the money was in fact borrowed for the copartnership, and went into its business.

4. It appeared that, prior to entering into the partnership relation,

---

although relating to matters equally within the knowledge of the deceased.

3. *McHugh v. Dowd Estate*, 86 Mich. 412, holding that an administrator cannot waive the provisions of the statute which prohibit a claimant against the estate from testifying to facts, tending to support the claim, which were equally within the knowledge of the deceased; and *Ripley v. Seligman*, 88 Mich. 177, citing the McHugh case with approval, but holding that the decedent's assigns may waive such provisions.

4. *Lilley v. Insurance Co.*, 92 Mich. 153, 158, holding that where the testimony of the assignee of a life-insurance policy regarding his possession and the assignment of the policy, and the transactions between him and the policy-holder leading up to the assignment, is taken orally in probate court on the application of the administrator of the estate of the policy-holder, who claims that the assignment, while absolute on its face, was really given as security, the administrator, by introducing the testimony as evidence on the hearing of a suit brought by him against the assignee to secure a re-assignment of the policy on payment of the amount due the assignee, waives the provisions of the statute prohibiting the assignee from testifying to matters equally within the knowledge of the policy-holder, at least as to the transactions inquired of in the probate court, and introduced as the declarations of the assignee.

5. *Dunlap v. Dunlap*, 94 Mich. 11, holding that the disability of a widow, who claims to be the owner by gift from her husband of certain notes which the heirs seek to charge her with on the final settlement of her account as administratrix, to testify in her own behalf to the entire transaction between herself and husband relative to the gift to her of the notes, is waived by the heirs calling her as a witness, and interrogating her as far as they see fit as to such transaction.

the decedent and the managing partner had made advances to the third partner to enable him to carry on the business to which the firm succeeded, and that the third partner had secured them by mortgages upon his property, upon which default had been made at the time of entering into the contract which was afterwards held to create the partnership relation, and which was made because it was deemed advisable to carry on the business under an arrangement which would protect the interests of the mortgagees, and insure the payment of the mortgage indebtedness at the earliest possible moment. And it is held that the court was not in error in excluding the question, asked the managing partner, whether he made advances to the third partner to carry on the business before the partnership agreement was made.

Error to Macomb. (Canfield, J.) Argued October 26 and 27, 1893. Decided January 9, 1894.

Appeal from the disallowance of a claim against the estate of decedent. The estate brings error. Affirmed. The facts are stated in the opinion, and in 87 Mich. 248.

*Charles K. Latham* and *Bowen, Douglas & Whiting,* for appellant.

*Wilkinson & Post* (*Griffin & Warner,* of counsel), for claimant.

MONTGOMERY, J. The bank presented a claim against the estate, based upon a note made by E. K. Roberts, payable to Barnes Bros. or bearer, and by them indorsed in blank. This note was dated October 14, 1889, but, as the testimony shows, was given in renewal of one dated June 11 of the same year. The grounds upon which it is sought to charge the estate of Butler are that Butler was a partner of Roberts in conducting a certain fish business, and that the money was in fact borrowed for the copartnership, and went into the business. The relations existing between Butler, Roberts, and one Gauthier were somewhat considered in *Purvis v. Butler,* 87 Mich. 248, and it was

there held that under the circumstances appearing in that case, and in this as well, Butler was a partner, and that as to any contracts actually made on behalf of that business, and particularly for any money actually borrowed for and put into the business, Butler was liable. Among other provisions of the contract was the following:

"Said Ephraim K. Roberts shall have the general management of the said fishery business for the benefit of all concerned in the property, and, to carry out the purposes of this agreement, said Roberts shall have authority to make all contracts of importance connected with said business, either in the name of said Gauthier or in his own name, as he shall deem best. He shall have entire and sole control of the finances of said business, including the sale and disposition of all products of said business, and the handling of all money that goes into or is made from said business, except as is hereinafter stated."

1. The circuit judge directed a verdict for the claimant for the amount of the note and interest. This action on his part raises the question as to whether it was conclusively shown that the money advanced by the claimant actually went into the business, or whether the testimony adduced was subject to a construction which negatives the claim. The cashier of the bank admitted that he knew nothing of the fact that the note was given for the copartnership business at the time the note was taken, but that, on information obtained later, he filed the present claim.

The claimant called as witnesses E. K. Roberts, the maker, and one Reeves, who kept the books relating to the fishery business. On cross-examination by counsel for the estate, Roberts testified as follows:

"Mr. Butler didn't know of the execution of this note at the time it was executed,—that is, I don't think he did. Mr. Butler was aware, later, of the fact that I procured Barnes Brothers' indorsement in the fishery business. At the time this note was executed,—either of these notes, the

original or the renewal,—he was not aware of it, although he had solicited me to get some outside indorsement. He was not aware of the fact that I had procured Barnes Brothers, at this time, to indorse this note. I got the money myself,—this $2,000. I put it in the fish business.

" Q. I want to know what you did immediately at the time you got it. Did you deposit it in the bank?

"A. I don't know as I can tell exactly. As I understand, the books of the concern are here, and they can show.

" Q. I want to know what you did when the paying teller handed you the money. What then did you do with the money? I don't want to know what occurred a week or a day afterwards.

"A. I can't tell you. I know I borrowed it for the fish business.

" Q. I am not asking you that now. I want to know what you did with it at this time. Did you put it in your pocket, take it to the office, or put it in the bank, or what?

"A. I don't know.

" Q. Don't you recollect testifying before the commissioners on claims, in the claim presented by A. F. Wilcox, that you put that money in your pocket, and you were in the habit of carrying money in your pocket and about your person?

"A. I did that sometimes, and I might have done it in this case.

"Q. I ask you if you do not recollect that you testified before the commissioners on claims.

"A. I don't recollect in particular, although I think in this particular case I kept the money myself, and turned in other cash items which represented the $2,000, although I am not positive. The books will show exactly what was done with it.

"Q. Will the books show whether you took this money, or some other money, and put it into the business?

"A. I think they will.

"Q. Was it not your habit, when you borrowed money, after you took charge of the fish business, to put that money into your own pocket, or into your own bank account, and then expend from your own pocket, or your own bank account, money for the fish business?

"A. I had some means of my own in the bank, and this fish business, occasionally we would get hard up,— that is, the fish business would,—and claims would come

in that would need immediate payment. I would draw a check for the payment of these claims.

"*Q.* On your personal account?

"*A.* On my personal account, or usually take the currency from my own pocket,—my own money,—and keep the check myself until the bank account should be good for it, when I would draw it.

"*Q.* You would loan money to the fish business,—you would advance money to the fish business?

"*A.* I would advance money to the fish business individually until money would come in.

"*Q.* Until such time as the fish business could pay it back to you?

"*A.* Until the bank account was good for it. I held checks—the fish business checks—against the bank."[1]

Mr. Reeves testified that the avails of the note went into the business, and very clearly accounts for every dollar of it, using the books to refresh his recollection. It appears that checks to the amount of $1,986.22 had been issued, and Roberts advanced the money on them, retaining the checks in his hands for a few days, and, when they amounted to this sum, discounted the note of which the one in suit is a renewal, and, instead of going through the form of depositing the money in the bank and presenting the checks, turned in the checks in place of the money, and took credit for the difference between the amount of the checks and discount (some $40) and the amount of the note. Defendant's counsel quote the testimony of Reeves, as follows:

" I kept full track of the bank account; but, mind you, I neither deposited all the money got there, nor attended to all the discounts, but I kept track of the bank account. Here it is in my own handwriting.

" *Q.* Now, you say you never saw the money. Was it ever brought to that fish office?

"*A.* Never brought there.

---

[1] The banking business of the firm was transacted at the Third National Bank, and Mr. Roberts kept his private account at the Citizens' Savings Bank.

"Q. You kept track of the bank account? Your banking was done at the Third National Bank?

"A. Yes, sir.

"Q. Was that $2,000 ever deposited to the credit of the fish business in the Third National Bank?

"A. It wasn't.

"Q. Was any part of it?

"A. No, sir.

"Q. Not a single dollar?

"A. No, sir.

"Q. So no dollar of that money was brought by Mr. Roberts to that office, and no dollar of that money was deposited to the fish account in its bank,—is that right?

"A. That is right.

"Q. You didn't know that note was discounted except what he [Roberts] told you?

"A. No, I didn't.

"Q. You had no personal knowledge of it?

"A. No.

"Q. And you got your knowledge from Roberts, did you not?

"A. At the time, of course."

This testimony is in no way inconsistent with his previous statements. He nowhere claims that he was present when the note was discounted, but it does plainly appear that, on the same date the note was discounted, Roberts did voluntarily surrender and pay into the business the amount of the note, less the discount, and stated that it was in lieu of the cash received on the discount. It does not appear to be controverted that the note was discounted. The important question was, did Roberts turn into the business the amount of it? And his testimony, not being controverted, established the fact.

2. Error is assigned on the refusal of the court to permit the defendant's counsel to inquire of the witness Roberts as to what Reeves testified on the former trial. This ruling was clearly right. Until Reeves was made a witness on this trial, and the foundation laid for such testimony, it was clearly hearsay.

3. When Roberts was on the stand he was asked whether

he ever made any advances to Gauthier to carry on the fishery business before the contract was made between Gauthier, Butler, and himself. This question was excluded. There was no error in this ruling. The situation was entirely changed by the contract referred to. The management of the business was vested in Roberts, and it would certainly afford no presumption that he would continue to advance money because he had previously done so up to a point where it became necessary for him to take such precarious security as that afforded by this contract, except as such advance was made upon the security of the contract.

4. It is also insisted that certain of the testimony of Roberts was not admissible under the statute excluding a party from testifying to facts equally within the knowledge of a deceased party. But an examination of the record discloses that the counsel for the estate were the first to open up with the witness the subject covered by the testimony which they moved to strike out; and a further answer to the objection is that, if this testimony be excluded, there is still left sufficient uncontroverted testimony to have justified the circuit judge in directing a verdict. We do not wish to be understood as intimating that the objection would not have been sound under any circumstances. What we decide is that it is not available to appellant here.

We find no error in the record, and the judgment will be affirmed.

The other Justices concurred.